UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

ISSIAH YUSUF, LASANDRA YARBROUGH,
YULIANA YARBROUGH, and B.T.
YARBROUGH,                                      **MEMORANDUM & ORDER**
                                                15-CV-5545(EK)(ST)
                    Plaintiffs,


              -against-

CITY OF NEW YORK, Officers ERIC
CABRERA, KEITH DIPRESSO, and NICHOLAS
RIPA, et al.

                    Defendants.

------------------------------------x

ERIC KOMITEE, United States District Judge:

         This case arises out of a sequence of actions by the

New York City Police Department that, according to the

Plaintiffs, occurred during an "ongoing campaign of harassment"

by the NYPD against Issiah Yusuf and his family.  Second Amended

Complaint ("SAC") ¶ 21, ECF No. 57.  Three events are

principally at issue: Yusuf's March 2015 arrest for public

consumption of alcohol and trespassing; the NYPD's April 2015

search of the home of Yusuf's mother, Lasandra Yarbrough; and

Yusuf's July 2015 arrest on robbery charges.

         Plaintiffs bring claims under 42 U.S.C. § 1983 and

New York law.[1]  Yusuf contends that during the March 2015 incident he was subject to an illegal stop and search, excessive force, and falsely arrested.  Lasandra Yarbrough (Yusuf's mother), Yuliana Yarbrough (her daughter), and B.T. Yarbrough (her minor son) contend that during the April 2015 search of Lasandra's home, they were falsely arrested and subject to abuse of process; Yuliana and Lasandra also bring excessive force claims.  Lastly, Yusuf sues for malicious prosecution and the denial of the right to a fair trial in connection with his July 2015 arrest for robbery.  The remaining defendants are Officers Eric Cabrera, Keith DiPresso, and Nicholas Ripa of the New York City Police Department, several unnamed officers, and the City of New York.[2]

Defendants now move for summary judgment on all claims.  For the reasons below, Defendants' motion is denied as

---

[1] The operative complaint — the Second Amended Complaint, or SAC — named several causes of action but did not specify which Plaintiffs asserted which claims against which Defendants.  At the Court's request, Plaintiffs filed (and then revised) a chart setting out that information.  *See* ECF No. 151 (revised chart).

[2] At the time Plaintiffs filed their Second Amended Complaint, the named individual defendants were Police Officers Nicholas Testani, Anthony Byrd, Andy Mitchell, Jonathan Ringel, Richard Demartino, Keith Dipresso, William Glynn, Eric Cabrera, and Neil Casey.  As of the date of this order, the remaining named individual defendants are Officers Cabrera, Ripa, and DiPresso.

to Yusuf's claims for unreasonable search, but granted as to the rest of Plaintiffs' claims.

## I.   Background[3]

As noted, the events in question transpired on three different dates.  Viewed in the light most favorable to Plaintiffs — the non-moving parties — the facts are as follows.

### A.   Event One: Yusuf's March 13 Arrest For Trespassing

On the evening of March 13, 2015, Yusuf entered the lobby of a building in the Hammel Houses, a public housing project in the Rockaways.  Pl. 56.1 ¶¶ 1, 5.  Yusuf lived in the Hammel Houses, but not in that building.  *Id.* ¶ 10; 50-h Tr. 3:13-14, ECF No. 136-2.  He recognized some men who were drinking in the lobby and stopped to talk to them.  Pl. 56.1 ¶ 4.  The men had cups in their hands, and there was a brown bottle on the floor.  *Id.* ¶ 3.

Officer Cabrera and a partner were on patrol in the housing project; when they drove by the building in question, Cabrera noticed three individuals standing outside the lobby.

---

[3] The facts in this order are drawn from the parties' submissions in connection with the motion for summary judgment, including Defendants' Local Rule 56.1 Statement ("Def. 56.1" (ECF No. 140-2)), and Plaintiffs' opposition to this statement ("Pl. 56.1" (ECF No. 127)). The facts are viewed in the light most favorable to Plaintiffs; factual assertions from Defendants' 56.1 statement are not disputed unless otherwise noted.  Citations to a party's Rule 56.1 Statement should be read to incorporate the documents cited therein.  For convenience, Defendants' supporting memorandum of law will be referred to as "Def. Br." (ECF No. 134) and Plaintiffs' opposition submission as "Pl. Opp." (ECF No. 126).

*Id.* ¶ 5.  Cabrera made a U-turn and drove back to the building, where the individuals were now inside the lobby.  *Id.* ¶¶ 6-7. One of them was holding the building door open.  *Id.* ¶ 12. There were "no trespassing" and "no loitering" signs posted in the lobby.  *Id.* ¶ 11.

Yusuf and Cabrera both acknowledge some familiarity with the other.  Yusuf knew who Cabrera was from "seeing [him] around the neighborhood," *see* Dep. of Issiah Yusuf ("Yusuf Dep.") 65:19-23, ECF No. 136-3; Cabrera also recognized Yusuf, and knew he did not live in that building.  Def. 56.1 ¶ 10.

The parties agree that some individuals in the lobby were drinking, but disagree about whether Yusuf was.  Officer Cabrera testified that as he circled back in the patrol car, he saw Yusuf "holding" and "chugging" a bottle.  *Id.* ¶¶ 7, 9; Dep. of Eric Cabrera ("Cabrera Dep.") 51:6-7, 57:19-22, ECF No. 136-6.  According to Yusuf, the other men were drinking but he was not.  Pl. 56.1 ¶¶ 2, 7.  He says the brown bottle was on the floor, and that he did not know its contents.  *Id.* ¶ 3; 50-h Tr. 12:7-15, ECF No. 136-2.[4]

---

[4] The Court can consider 50-h hearing testimony on a motion for summary judgment.  *E.g.*, *Fontanez v. Skepple*, No. 12-CV-1582, 2013 WL 842600, at *3 (S.D.N.Y. Mar. 6, 2013), *aff'd*, 563 F. App'x 847 (2d Cir. 2014).  Under Section 50-h, "[w]herever a notice of claim is filed against a city, . . . the city . . . shall have the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made."  N.Y. Gen. Mun. Law § 50-h.

Officer Cabrera and his partner got out of their car and approached the building.  Pl. 56.1 ¶ 13.  Cabrera had his shield out, *id.* ¶ 14, but neither he nor his partner was in uniform.  Yusuf Dep. 62:7-8.  As they approached, the individual standing in the doorway of the building saw Cabrera and "took off up the stairs."  *Id.* 51:24-25.  Yusuf followed, Pl. 56.1 ¶ 18; Cabrera gave chase.  *Id.* ¶ 19.  In his deposition testimony, Cabrera acknowledged some uncertainty over whether Yusuf saw him approach: Yusuf "wasn't facing outside towards [Cabrera], he was facing inside . . . towards the elevator and staircase."  Cabrera Dep. 51:19-23.  Cabrera was "looking at his [Yusuf's] side."  *Id.* 52:4.

Viewed in the light most favorable to Yusuf, the record thus leaves open the possibility that Yusuf did not know it was the police approaching when he fled.  Yusuf's own testimony on this question, however, has varied.  At a 2015 hearing pursuant to New York General Municipal Law § 50-h ("50-h Hearing"), Yusuf testified that he "didn't know it was the police, but they ran – *somebody said that they were about to start shooting*, so I ran upstairs in the building."  Pl. ¶ 16 (emphasis added).  At his deposition in this case, he testified that he "heard voices of *someone telling me to come here*" and "ran because I didn't know the voice" and because "of some of the activities that goes on in that neighborhood."  Yusuf Dep.

5

50:17-51:20 (emphasis added).  Cabrera, for his part, testified that he did not say anything to Yusuf or the other individuals at this time.  Cabrera Dep. 63:1-8.

Regardless, Cabrera gave chase.  As he entered the lobby, he heard glass shattering in the stairwell, and when he opened the stairwell door, he saw broken glass with a Hennessy label.  Pl. 56.1 ¶¶ 20-21.  Cabrera ran up the stairs to the third floor, where he saw Yusuf exit the stairwell and turn into the first apartment on the right.  *Id.* ¶¶ 23-24; Cabrera Dep. 62:9-11.  Yusuf tried to close the apartment door, but Cabrera put his foot in the door and pushed himself inside.  Pl. 56.1 ¶ 25.

Inside the apartment, Officer Cabrera handcuffed Yusuf and another individual "for safety reasons" and took them out into the hallway.  Cabrera Dep. 65:20-22, 66:16-19.  Cabrera then searched Yusuf to "ma[k]e sure he didn't have anything on him."  *Id.* 68:3-12.  Cabrera searched from the "ankles up" – "[e]verything from head to toe" – including inside Yusuf's waistband, his pant and coat pockets, and underneath his shirt and sweater.  *Id.* 69:14-70:24.  He testified that when he searched Yusuf, he smelled alcohol on his breath.  Def.

56.1 ¶ 29; Cabrera Dep. 66:5-11.[5]  At that point, however, Cabrera did not intend to arrest Yusuf for a crime: he testified that "at the time, it was just going to be a summons" for alcohol.  Cabrera Dep. 57:13-16.  The search yielded no weapons or contraband.

Cabrera then spoke with the "owner / resident" of the apartment, Emma Baker, while on the third floor.  Pl. 56.1 ¶ 31.  According to Defendants, Ms. Baker informed Officer Cabrera that Yusuf was friends with her son, but that she had not given him permission to come into her apartment.  Def. 56.1 ¶ 33 (first citing Cabrera Dep. 67:3-6 (Cabrera testifies that "the lady" living in the apartment said "she knew them, but she never gave them permission to come inside the apartment"); and then citing *id.* 71:7-10 ("She stated to me that she does know them.  They're friends with her son.  But like I said, she said she never gave them permission to come in the apartment.")).

Yusuf testified that he was indeed invited to the building in question to play video games with Ms. Baker's son, Hareem Dempster.  Pl. 56.1 at 21, ¶ 2; Yusuf Dep. 57:24-58:5.  Yusuf also testified, at his 50-h hearing, that he heard Ms.

---

[5] Plaintiffs' 56.1 Counterstatement indicates that Cabrera's assertion is "[n]ot disputed."  Pl. 56.1 ¶ 29.  At oral argument, counsel explained that Plaintiffs do not dispute that Cabrera *testified* that he smelled alcohol on Yusuf, but they do dispute that Yusuf drank.  *See* Oral Argument Tr. 68:24-69:4, ECF No. 148.

Baker tell the officers: "if they're coming here with my son, they're not doing anything wrong."  Pl. 56.1 ¶ 32.  At his deposition, however, Yusuf conceded that an officer — he could not recall which — spoke with Ms. Baker out of his earshot for a period.  Yusuf Dep. 68:22-25 (Yusuf testifies that saw Ms. Baker "talking to an officer.  I don't remember which officer she was talking to."); *id.* at 69:15-70:2 (Yusuf acknowledges again that he saw an officer speaking with Ms. Baker, but doesn't recall which officer); *see also id.* at 69:22-24 (Q: were you able to hear what they were talking about?  A: No.).  Yusuf did not recall how long the officer's conversation with Ms. Baker lasted.  *Id.* at 69:25-70:2.

          Officer Cabrera and Sergeant Casey arrested Yusuf for Criminal Trespass in the Third Degree (a misdemeanor) and Public Consumption of Alcohol (an administrative code violation).  Pl. 56.1 ¶ 34.  After Yusuf was handcuffed, he "told one of the officers, I don't remember which one, that they [the cuffs] were too tight," but the officer said nothing in response.  Yusuf Dep. 68:16-19.  Yusuf sustained no physical injuries.  Pl. 56.1 ¶ 38.  Later, Officer Cabrera attempted on multiple occasions to obtain a sworn statement from Ms. Baker, but no one answered the door.  *Id.* ¶ 36.  The District Attorney's Office declined to prosecute, and Yusuf was released from Central Booking.  *Id.* ¶ 37.

**B.    Event Two: April 17 Execution of Search Warrant**

Nearly a month later, a Queens County criminal court issued a "no knock" warrant authorizing entry into Yusuf's mother's apartment on Rockaway Beach Boulevard to search for marijuana.  Pl. 56.1 ¶ 39; Search Warrant, ECF No. 136-12; Dep. of Lasandra Yarbrough ("Lasandra Dep.") 65:1-66:6, ECF No. 128-4.  On the morning of April 17, the NYPD's Emergency Services Unit executed the search.  Pl. 56.1 ¶ 44.  Lasandra was home with her children, including Yuliana (then age fifteen), and her four-year-old boy, B.T.  *Id.* at 21, ¶¶ 5, 7.  Yusuf was not present, and Officer Cabrera played no role in this incident.

According to Plaintiffs, officers pointed guns at Lasandra and the children.  *Id.*  One of "the first officers who entered" placed Lasandra in handcuffs in the living room.  Def. 56.1 ¶ 45.  An unidentified officer stood on Yuliana's bed, tightly handcuffed her, and pulled her from the bed.  Pl. 56.1 at 22, ¶¶ 8-10.  Yuliana complained that the handcuffs were too tight.  *Id.* ¶ 9.  Yuliana testified: "[the officer] told me to give him a minute, and will have someone loosen them, or he will do it."  Dep. of Yuliana Yarbrough ("Yuliana Dep.") 27:7-20, ECF No. 128-5.  The officer loosened Yuliana's handcuffs when he brought her into the living room.  *Id.*  Another officer brought B.T. into the living room but did not handcuff him.  Pl. 56.1 ¶ 47.

9

Officer Keith DiPresso participated in the search, though he had no role in the investigation leading to the warrant's issuance.  When DiPresso entered the apartment, he proceeded directly to the back bedroom, where non-party Brian Thomas was already handcuffed.  *Id.* ¶¶ 48–50.  DiPresso found marijuana on the nightstand.  *Id.* ¶ 49.  Thomas was the only civilian in that room.  *Id.* ¶ 50.  DiPresso and the other officers then proceeded to the bedroom of non-party Aziz Yarbrough, where DiPresso found more marijuana.  *Id.* ¶¶ 52–53.  The officers placed Thomas and Aziz Yarbrough under arrest.  *Id.* ¶ 54.  DiPresso did not interact with any of the Plaintiffs during the search.  *Id.* ¶ 56.

**C.    Event Three: Yusuf's July 19 Arrest on Robbery Charges**

On the evening of July 18, a man named Jose Nieves was operating a "dollar van" in Queens when several individuals stopped the van and robbed him of a gold chain and money.  Pl. 56.1 ¶¶ 57–58.  Defendant Ripa and non-party Sergeant Knight interviewed Nieves the next day.  *Id.* ¶ 59.  Nieves identified the four individuals he believed had robbed him, including Yusuf, and showed Officer Ripa social-media photos of them on his phone.  *Id.* ¶¶ 63–64.  Ripa prepared a "complaint report" listing Yusuf as a suspect, and Yusuf was arrested on July 19 by a non-party officer.  *Id.* ¶¶ 66–67.  After his arrest, Yusuf told Ripa that he did not commit the robbery.  *Id.* ¶ 69.

In his claims against Ripa, Yusuf points to some discrepancies between the reports prepared in connection with the arrest.  In the complaint report, Ripa wrote that "known apprehended perp Unique Wooden" struck Nieves in the face and took his gold chain.  Omniform Complaint Report 2, ECF No. 136-13.  The arrest report, also prepared by Ripa the day of Yusuf's arrest, states that Yusuf, "acting in concert with three others," punched Nieves repeatedly in the face and took his jewelry and money.  Omniform Arrest Report 2, ECF No. 128-15.

Assistant District Attorney Gregory Lasak subsequently interviewed Nieves by phone.  Pl. 56.1 ¶ 75; Intake Bureau Crime Report 6, ECF No. 136-15.  Lasak completed an Intake Bureau Crime Report based on the information Nieves provided; the report stated that Yusuf attempted to gain entry to Nieves's van through the passenger door and motioned to his waistband area while threatening Nieves, and that other individuals, including Unique Wooden, "repeatedly punch[ed]" Nieves.  Intake Bureau Crime Report 3.  A criminal complaint, drafted by ADA Lasak and signed by Officer Ripa, issued on July 19.  Pl. 56.1 ¶ 78.  The complaint repeated the allegations that Yusuf tried to enter Nieves's van through the passenger door and motioned to his waistband while threatening Nieves.  *Id*.

The day after Yusuf's arrest, Nieves came to the precinct and informed Ripa that he wanted to withdraw his

complaint and specifically stated that Yusuf was not present during the robbery. *Id.* ¶ 70; Letter from Nieves, ECF No. 128-16. In private, Nieves told Ripa he had been threatened and was afraid. Pl. 56.1 ¶ 72. Ripa informed the District Attorney's office that Nieves came into the precinct appearing visibly shaken and wanted to withdraw his complaint. *Id.* ¶ 74.

In an effort to shore up the case, Officer Ripa obtained two surveillance videos taken near the scene. *Id.* ¶ 90. The first was from a convenience store across the street from Nieves's van; it showed Yusuf getting into a car and leaving the scene at 7:44 p.m. *Id.* ¶ 99. The second was an NYPD surveillance video from a nearby bus stop, which captured the robbery from a distance at 7:54 p.m. *Id.* ¶ 100. Neither video clearly showed Yusuf's participation in the robbery or where he went between 7:44 and 7:54.

Ripa sent both videos to ADA Tara DiGregorio, a prosecutor assigned to the case. *Id.* ¶ 90. As discussed below, the record does not reveal the exact dates on which Ripa received the videos and sent them to DiGregorio. On July 28, however, after DiGregorio had viewed the videos, she decided to drop the charges while the case was still pending before the grand jury. *Id.* ¶¶ 102–03. DiGregorio testified that she concluded the state had insufficient evidence to convict. Dep. of Tara DiGregorio ("DiGregorio Dep.") 24:6-10, ECF No. 136-9.

## II.  Procedural History

Plaintiffs initiated this action in 2015 against the City, various named officers, and ten John and Jane Doe defendants.  They subsequently amended the complaint twice.  The second amended complaint – the one that is currently operative – alleged thirteen claims arising from three separate events: (1) Yusuf's arrest on March 13; (2) the search of Lasandra Yabrough's home on April 17; and (3) Yusuf's arrest on July 19 in connection with the Nieves robbery.  SAC ¶¶ 63–119.

Plaintiffs have since abandoned several claims.[6]  At oral argument on the summary judgment motion, the Court called for greater specificity regarding which of the remaining claims were asserted against which defendants, in light of the operative complaint's lack of specificity.  Plaintiffs responded with a chart indicating the following:

---

[6] At the parties' request, the Court entered a stipulation of dismissal as to Count Nine (negligent hiring, training, and retention against the City), Count Ten (intentional infliction of emotional distress), Count Eleven (negligent infliction of emotional distress), and Count Twelve (failure to intervene).  Stipulation & Order of Partial Dismissal, ECF No. 119.

Later, during briefing and oral argument on Defendants' summary-judgment motion, Plaintiffs moved to dismiss more claims.  See Pl. Opp. 27; Oral Argument Tr. 148:11-13, 47:11-48:1, ECF No. 148.  These claims may be "dismissed at the plaintiff's request only by court order." Fed. R. Civ. P. 41(a)(2).  I hereby dismiss all claims that Plaintiffs did not include in their chart of remaining claims.

- In connection with the March 13 arrest, Yusuf alleges Section 1983 and state-law false arrest,[7] unreasonable stop and search, and excessive force claims against Officer Cabrera, and the same state-law claims against the City.

- In connection with the April 17 search of their home, the three Yarbroughs allege Section 1983 false arrest and abuse of process against Officer DiPresso; Yuliana alleges Section 1983 excessive force against DiPresso; and Lasandra alleges state-law false arrest and abuse of process claims against DiPresso and the City, as well as an assault and battery against just the City.[8]

- In connection with the July 19 arrest, Yusuf alleges Section 1983 malicious prosecution and denial of the right to a fair trial against Officer Ripa.[9]

---

[7] In each place that Plaintiffs' chart includes a false arrest claim, Plaintiffs write "false arrest/unreasonable detention." ECF No. 151. To the extent Plaintiffs are attempting to pursue unreasonable detention claims, those claims are dismissed because Plaintiffs never asserted such claims in their complaint.

[8] The chart states that Lasandra Yarbrough brings a state-law claim for "excessive force," but the SAC refers to it as "state law assault and battery." *Compare* ECF No. 151, *with* SAC ¶¶ 83-86. I will refer to this claim as an assault and battery claim.

[9] ECF No. 151 (revised chart). The chart includes no allegations against the remaining Doe defendants. For that reason, and because the remaining Jane or John Doe defendants have not been identified even after the close of discovery, any claims previously levied against them are now dismissed. *See Keesh v. Artuz*, No. 97-CV-8417, 2008 WL 3166654, at *2 (S.D.N.Y. Aug. 6, 2008) ("Even after discovery, plaintiff has failed to identify the 'John Doe' and 'Jane Doe' defendants. Accordingly, the complaint against them must be dismissed."); *cf. Warren v. Goord*, 476 F. Supp.2d 407,

### III. **Summary Judgment Standard**

Summary judgment is appropriate if the record
demonstrates that "there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law."  Fed R. Civ. P. 56(a).  "A fact is material for these
purposes if it might affect the outcome of the suit under the
governing law.  An issue of fact is genuine if the evidence is
such that a reasonable jury could return a verdict for the
nonmoving party."  *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263
F.3d 208, 212 (2d Cir. 2001).[10]

The movant has the burden of demonstrating the absence
of a question of material fact.  *Anderson v. Liberty Lobby*,
*Inc.*, 477 U.S. 242, 256 (1986).  If the movant carries its
burden, "the nonmoving party must come forward with admissible
evidence sufficient to raise a genuine issue of fact for trial
in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser
Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  If the non-moving party
fails to do so, summary judgment will be granted.  Entry of
summary judgment is appropriate "against a party who fails to
make a showing sufficient to establish the existence of an

---

413-14 (S.D.N.Y.2007) ("[T]he Court will not dismiss the claim against John
Doe until plaintiff has had sufficient discovery to name the defendant.").

[10] Unless otherwise noted, when quoting judicial decisions this order
accepts all alterations and omits all citations, footnotes, and internal
quotation marks.

15

element essential to that party's case, and on which that party

will bear the burden of proof at trial." *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986).

## IV.   Discussion

### A.   Event One: Yusuf's Arrest on March 13

Yusuf makes four sets of claims (each under federal

and state law) against Officer Cabrera in relation to his

March 13 arrest: (1) unreasonable stop; (2) unreasonable search;

(3) false arrest; and (4) excessive force.  Yusuf also alleges

that the City is vicariously liable for the state-law claims.

#### 1.   Unreasonable Stop

Yusuf argues, first, that Cabrera lacked reasonable

suspicion when he stopped, handcuffed, and searched him on the

third floor.  Yusuf alleges "unreasonable stop and search" as

one cause of action.  *See* SAC ¶¶ 63-64.  But the type of

suspicion required to justify the stop differs from that

required to justify the search, as discussed below.  For that

reason, I discuss the stop in this section and the search in the

next.

Cabrera had the reasonable suspicion required to

justify the stop of Yusuf on the third floor.  "[A]n officer

may, consistent with the Fourth Amendment, conduct a brief,

investigatory stop when the officer has a reasonable,

articulable suspicion that criminal activity is afoot."

16

*Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).[11]  "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."  *Id.*  "'Reasonable suspicion' is a rather lenient test," and a court "must consider the totality of the circumstances" in making its assessment.  *United States v. Sanders*, 208 F.3d 204, at *1 (2d Cir. 2000) (unpublished summary order).

        Here, several factors contributed to Officer Cabrera's reasonable suspicion that criminal activity — specifically trespassing — was afoot.  Cabrera knew that Yusuf did not live in the building.  Pl. 56.1 ¶ 10.  He saw someone in the doorway, "propping the door" open.  *Id.* ¶ 12; Cabrera Dep. 50:1-4.  There were "no trespassing" and "no loitering" signs posted in the lobby.  *Id.* ¶ 11.  And Yusuf and the other individuals ran up the stairs as the officers approached.  *Id.* ¶ 18.  Unprovoked flight from the police "is certainly suggestive of wrongdoing and can be treated as suspicious behavior that factors into the

_____

[11] Because "[s]earch and seizure rights under the New York State and United States constitutions are . . . largely coextensive," the Court analyzes Yusuf's federal and state-law claims together.  *See Febres v. City of New York*, 238 F.R.D. 377, 392 (S.D.N.Y. 2006); *see also People v. Johnson*, 488 N.E.2d 439, 406 (1985) ("[T]he proscription against unlawful searches and seizures contained in N.Y. Constitution, article I, § 12 conforms with that found in the 4th Amendment, and . . . this identity of language supports a policy of uniformity between State and Federal courts.").

totality of the circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 587 (2018); *see also United States v. Davenport*, 303 F. App'x 42, 44 (2d Cir. 2008) (suspect's flight after officer approached him contributed to reasonable suspicion). Finally, Cabrera saw Yusuf run hurriedly into an apartment that he knew was not Yusuf's.  He did not know whose apartment it was or what Yusuf and his friend were doing there.  Thus, once Cabrera caught up to Yusuf, it was reasonable for him to conduct a brief investigatory stop.

Because Officer Cabrera had a reasonable basis to conclude that Yusuf was committing or had committed a criminal offense — trespass — Cabrera was justified in making the *Terry* stop that Yusuf challenges.

2.   Unreasonable Search

Yusuf testified that outside Ms. Baker's apartment, Cabrera "pushed [him] against the wall and started searching" him.  Yusuf Dep. 22:16-17.  As described by Cabrera, he searched Yusuf "from head to toe," including inside his waistband, pant and coat pockets, and underneath his shirt and sweater.  Cabrera Dep. 69:14-70:24.

To conduct a *pat-down* during a *Terry* stop, the officer must have more than a reasonable basis to believe that a crime has been committed:  he must also have a reasonable basis to believe the person stopped is armed and dangerous.  *See United*

18

*States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (citing *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009)). "The Supreme Court has emphasized that the goal of the frisk is not to discover evidence of crime, but to help law enforcement ascertain whether a suspect has a weapon which might be used to harm the officer or others nearby." *United States v. Weaver*, 9 F.4th 129, 140 (2d Cir. 2021).

The Defendants have not established — or even argued, really — that Cabrera had a reasonable basis to think Yusuf was armed and dangerous. Cabrera says that when he conducted the *Terry* stop, he suspected Yusuf of trespassing and public consumption; neither is the kind of conduct that would logically be expected to involve the use or possession of a firearm. More generally, Cabrera simply has not, at this point, proffered the "specific and articulable facts" that the Supreme Court says are necessary to satisfy *Johnson's* "reasonable basis" test. Cabrera testified that, "for safety reasons," he handcuffed Yusuf and "made sure he didn't have anything on him." Cabrera Dep. 68:8-12.[12] But the only "safety reasons" Cabrera identified were that

---

[12] The testimony suggests that Cabrera handcuffed Yusuf prior to the search that Yusuf argues was conducted without reasonable suspicion. Yusuf does not contend that the handcuffing transformed the stop into a full-blown arrest. *Cf. Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017) ("In general, to determine whether a *Terry* stop is so intrusive as to become an arrest, we look to: the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target

19

he knew Yusuf did not live in that apartment, he did not know whose apartment it was, and "[t]here could possibly be a gun at the apartment." *See id.* at 65:4-22.  It is settled law that "a police officer, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists." *Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017).  But he must have a reasonable belief that some danger exists, as noted above. *See United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990) ("The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).  Cabrera's statement that there "could possibly" have been a gun in the apartment does not meet that standard.  Cabrera Dep. 65:20-21.[13]

---

of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.").

   [13] Though not dispositive here, it bears mentioning that Cabrera testified he was searching Yusuf not only for guns, but also for "contraband . . . [l]ike drugs." *Id*. at 72:17-21; *see also id*. at 72:22-23 ("Q: And why were you searching for drugs?  A: These kids like smoke weed . . . .").  The Supreme Court, however, has been clear that the "purpose of this limited [*Terry*] search is not to discover evidence of crime . . . .  Rather, a protective search — permitted without a warrant and on the basis of reasonable suspicion less than probable cause — must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to

And the search was not justified as a search incident to arrest. A search incident to arrest may occur prior to the formal arrest, so long as the officer has probable cause. *See e.g.*, *United States v. Wilson*, 94 F. App'x 14, 17 (2d Cir. 2004) ("Once probable cause was established, it is irrelevant whether the officers' searches of Wilson occurred prior or subsequent to his arrest."). But Cabrera has not established that he had probable cause to arrest *at this point* for trespass. The cases assessing probable cause for trespass arrests typically require the officer to do something to establish that the suspect is on the premises without a resident's invitation. *See, e.g.*, *Mitchell v. City of New York*, 841 F.3d 72, 78 (2d Cir. 2016) ("[O]fficers must have probable cause to believe that a person does not have permission to be where she is before they arrest her for trespass."). And Cabrera had not done so when he searched Yusuf.[14] Cabrera cannot assert probable cause to arrest Yusuf for public consumption at this stage because there is a dispute of fact, as noted above, regarding whether Yusuf was drinking at all. Yusuf's unreasonable search claims — federal and state — will proceed.

---

harm the officer or others nearby.'" *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry*, 392 U.S. at 26)).

[14] The probable-cause determination is objective, not subjective, and thus Cabrera's personal view is not at issue. Still, Cabrera testified that he did not believe he had probable cause to arrest Yusuf for trespass at this point. Cabrera Dep. 67:19-24.

It is worth noting that even if Yusuf succeeds on these claims at trial, he is alleging only a momentary violation:  As I conclude below, Cabrera established probable cause to arrest Yusuf (and search him incident to arrest) moments later, when he obtained evidence that Yusuf did not have permission to be in the building.  But there is no *de minimis* exception to an officer's liability for an unreasonable *Terry* stop or search.  *E.g.*, *Rodriguez v. United States*, 575 U.S. 348, 356 (2015).  Accordingly, Defendants' motion for summary judgment is denied on Yusuf's unreasonable search claims.

3.  <u>False Arrest</u>

Yusuf next argues that the officers lacked probable cause to arrest him for either trespass or public consumption.  To prevail on a false arrest claim under New York law, a plaintiff must prove that: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995).  The elements of a false arrest claim under Section 1983 are "substantially the same."  *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (per curiam).  It is the fourth element that is disputed here, as the existence of probable cause is a "complete defense" to claims of false

arrest.  *Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir. 1999).

Even without probable cause, "an arresting officer will . . . be entitled to qualified immunity from a suit for damages if he can establish that there was arguable probable cause to arrest."  *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004).  "A police officer has arguable probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."  *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016).  The question is "not whether the officer should have acted as he did," but rather "whether any reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, could have determined that" probable cause existed. *Id.*  As the Supreme Court has repeatedly recognized, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).  Still, the burden of proving the affirmative defense of qualified immunity rests with the defendant.  *Gomez v. Toledo*, 446 U.S. 635, 640-41 (1980).

Even viewing the facts in the light most favorable to Yusuf, the false-arrest claims must be dismissed because Cabrera had probable cause — and certainly "arguable" probable cause —

to believe that Yusuf was trespassing, once he spoke to the "owner / resident" of the apartment and she denied knowledge that Yusuf was invited.  New York Penal Law Section 140.10 provides that a person "is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in a building or upon real property . . . (e) where the building is used as a public housing project in violation of conspicuously posted rules or regulations governing entry and use thereof." N.Y. Penal Law § 140.10(e).  And "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."  *United States v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).

Cabrera had probable cause to arrest Yusuf for trespass after speaking to Ms. Baker.  As noted above, Cabrera knew the following *before* his communication with Ms. Baker: he had observed Yusuf in the lobby of a building that he knew was not Yusuf's.  Pl. 56.1 ¶ 10.  There were "no trespassing" signs posted in the lobby.  *Id.* ¶ 11.  When Cabrera approached, Yusuf and his cohort fled, *id.* ¶ 18; this flight is significant, even if it is not dispositive.[15]

---

[15] "Headlong flight — wherever it occurs — is the consummate act of evasion:  It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."  *Wardlow*, 528 U.S. at 124.  And it is irrelevant that

Even after witnessing this sequence, however, Cabrera engaged in further inquiry before making the full arrest.  He testified that Ms. Baker told him that she "didn't give Yusuf permission to be in her apartment," even if she knew him as her son's friend.  Cabrera Dep. 76:20-77:4.  Critically, Yusuf does not deny that this conversation occurred; nor could he, given both parties' acknowledgment that Cabrera spoke with Ms. Baker for some period of time — Yusuf does not recall how long — out of Yusuf's earshot.  Pl. 56.1 ¶ 30 (not disputing that while Yusuf was still in the hallway, "Officer Cabrera went back into the apartment to speak with" Ms. Baker); Yusuf Dep. 69:22-24 (Q: Were you able to hear what they were talking about?  A: No.).

These facts protect Cabrera from suit.  *See Jackson v. City of White Plains*, No. 05-CV-0491, 2015 WL 4739762, at *5 (S.D.N.Y. Aug. 7, 2015) ("Courts in this District and in the State of New York have found probable cause to arrest an individual for trespassing in a public housing project when police confirm with a resident of the building that the suspected trespasser does not live there."); *cf. Davis v. City of New York*, 902 F. Supp. 2d 405, 413-14 (S.D.N.Y. 2012) (officer had probable cause to arrest where he was "aware of the

_____

Yusuf claims not to have *known* it was the police he was fleeing from: for qualified-immunity purposes, the analysis is limited to the facts known by the arresting officer at the time of the arrest.  *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006).

following facts: (1) Osorio had been in the lobby of the building, (2) Osorio was not a resident of the building, (3) Osorio said he had been in apartment 5C, and (4) the current occupant of 5C said that Osorio had not been there").

Yusuf did testify at his 50-h hearing that he heard the officers ask Ms. Baker, "do you want them here," and that she replied, "if they're coming here with my son, they're not doing anything wrong." 50-h Tr. 28:17-25, ECF No. 128-9. Taking this assertion as true (as we must), it is still not incompatible with Cabrera's testimony. A layman's observation that someone is "not doing anything wrong" is not the same thing as a statement that the person was invited onto a given premises. More importantly, the statement that Yusuf attributes to Ms. Baker's was conditional — "*if* they're coming here with my son" — and the record gives no indication that the condition was satisfied (let alone that Cabrera knew it was). Specifically, there is no indication that Ms. Baker's son, Hareem Dempster, was anywhere among the cohort gathered in the lobby.[16] Under the circumstances, it would have been a reach for Cabrera to believe

---

[16] If anything, the record suggests otherwise. *See* 50-h Hearing Tr. 11:22-13:24 (Yusuf "recognized" the men in the lobby but did not know if they lived in the building; Yusuf told them he was there visiting his friend, Mr. Dempster, who they "[p]robably" knew); Yusuf Dep. 52:20-53:6 (testifying that Yusuf and Mr. Ponder ran up the stairs to Mr. Dempster's apartment); Cabrera Dep. 59:8-9, 64:13-21 (Cabrera chased Yusuf and another individual up the stairs; "as soon as [he] pushed [him]self in," he saw Yusuf and Ponder with "their hands up" and "sweating").

that Yusuf had been invited to stand in the lobby by a non-party
to that gathering who happened to be three floors up.  *See,
e.g., Jackson*, 2015 WL 4739762, at *6 (finding no constitutional
violation — and declining even to reach the question of
qualified immunity — where defendant officers "verified that
Plaintiff was neither a resident nor a visitor of the building
before [they] placed Plaintiff under arrest for criminal
trespass").[17]

One might question the wisdom of a law that
criminalizes mere presence in the lobby of a public-housing
tenant's neighboring apartment building.[18]  But for purposes of
the instant constitutional (and qualified-immunity) analysis,
the Court must of course take the criminal code as it actually
existed.  On this law and the undisputed facts of this case,
Cabrera had probable cause (and, therefore, arguable probable
cause) to believe that Yusuf was trespassing.

---

[17] In *Jackson*, the court granted summary judgment to the defendants
despite the "Plaintiff essentially contend[ing] that everyone is lying."  *Id.*
The court held that the plaintiff's "self-serving statements, absent any
supporting direct or circumstantial evidence," were insufficient to defeat
the motion.  *Id.*

[18] As courts have recognized, however, there are important interests on
both sides of this question.  "Prohibiting trespass and loitering on NYCHA
property by uninvited strangers is understandably important to many
residents:  the buildings are their homes.  The Legislature has reasonably
determined that, for the safety and well-being of NYCHA residents, access to
the buildings should be restricted to residents and their invited guests."
*Davis*, 902 F. Supp. 2d at 421.

Given that conclusion, I need not reach the question of probable cause for the public-consumption arrest. "[W]hen faced with a claim for false arrest, we focus on the validity of the *arrest*, and not on the validity of each charge." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) ("Because the arresting officer in this case had probable cause to arrest Jaegly for the charged crime of second degree harassment, however, we need not consider whether probable cause existed for an uncharged crime."); *see also Tompkins v. City of New York*, 50 F. Supp. 3d 426, 433 (S.D.N.Y. 2014) ("As long as there was probable cause to arrest the plaintiff for *any* offense . . . a false arrest claim will fail.").

4.    Excessive Force Against Yusuf

Police use of force is "excessive, in violation of the Fourth Amendment, if it is objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004).[19]  Yusuf claims that the officers used excessive force when they handcuffed him too tightly, but he cannot identify the officer who handcuffed him.

---

[19] The state-law equivalent of a federal excessive force claim is for assault and battery.  "Except for § 1983's requirement that the tort be committed under color of state law, the essential elements of excessive force and state law assault and battery claims are substantially identical." *E.g.*, *Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009).  The Court thus analyzes Yusuf's excessive force and assault and battery claims as one.

*See* Yusuf Dep. 68:18-19, 69:7-21.  He thus alleges that Officer Cabrera – the only defendant named this claim – is liable, at the least, for failing to intervene.  Oral Arg. Tr. 73:17-22, ECF No. 148.  A police officer may be held liable for his failure to intervene if he observes a fellow officer using excessive force and has sufficient time to act to prevent it. *Figueroa*, 825 F.3d at 106.  "Liability attaches on the theory that the officer, by failing to intervene, becomes a tacit collaborator in the illegality."  *Id.*

In evaluating an excessive force claim arising out of the use of handcuffs, "a court must consider (1) whether the handcuffs were unreasonably tight, (2) whether the defendants ignored the plaintiff's pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists."  *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 377 (S.D.N.Y. 2015).  "The injury requirement is particularly important."  *Rolkiewicz v. City of New York*, 442 F. Supp. 3d 627, 638 (S.D.N.Y. 2020).  "In fact, there is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort."  *Id.* (citing *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008)).  "These injuries need not be severe or permanent, but must be more than merely de minimis."  *Id.*; *cf. Saheed v. City of New York*, No. 17-CV-1813, 2020 WL 1644006,

at *15 (S.D.N.Y. Apr. 2, 2020) (plaintiff's wrist injuries were more than *de minimis* where ambulance and emergency room records showed that he complained of pain, he continued to complain of pain at least seventeen days later, and his doctor ordered an x-ray and prescribed ibuprofen for continued pain).[20]

Yusuf alleges no injury from the handcuffs and has adduced no evidence of injury.  Pl. 56.1 ¶ 38.  His excessive force claim thus fails as a matter of law, as does his argument that Cabrera failed to intervene.  Accordingly, summary judgment is granted as to Yusuf's excessive force claims.

5.    *Respondeat Superior* Claims

Yusuf also alleges state-law *respondeat superior* claims against the City for unlawful stop and search, false arrest, and excessive force.  "Unlike cases brought under § 1983, municipalities may be liable for the common law torts,

---

[20] Plaintiffs argues that under *Cugini v. City of New York*, 941 F.3d 604 (2d Cir. 2019), a plaintiff is no longer required to show an injury to claim excessive force based on handcuffing.  *Id.* at 613; *see* Pl.'s Opp. 24; *see also* Oral Argument Tr. 49:13-50:6, ECF No. 148.  This Court does not read *Cugini* as providing an alternative to the injury requirement.  In *Cugini*, the Second Circuit held that a plaintiff "need not always establish that she *alerted* an officer to the fact that her handcuffs were too tight or causing pain."  941 F.3d at 613. (emphasis added).  Rather, "the question is more broadly whether an officer reasonably should have known during handcuffing that his use of force was excessive," which a plaintiff can show "if either the unreasonableness of the force used was apparent under the circumstances, or the plaintiff signaled her distress, verbally or otherwise, such that a reasonable officer would have been aware of her pain, or both."  *Id.*  The Second Circuit did not address the injury requirement at all.  Moreover, Defendants have highlighted ample post-*Cugini* case law continuing to require an injury that is more than *de minimis*.

like false arrest . . . , committed by their employees under the doctrine of *respondeat superior*." *Biswas v. City of New York*, 973 F. Supp. 2d 504, 539 (S.D.N.Y. 2013). "If the plaintiff is able to establish any of his pendent state law claims, he can recover against the City of New York under the common law doctrine of *respondeat superior*." *Anderson v. City of New York*, 817 F. Supp. 2d 77, 99 (E.D.N.Y. 2011).

Because Yusuf fails as a matter of law to establish individual liability against Officer Cabrera for unreasonable stop, false arrest, and assault and battery, he cannot establish *respondeat superior* liability for those claims. *E.g., Velez v. City of New York*, 730 F.3d 128, 137 (2d. Cir. 2013) (noting that if an employee was not liable, "there is no basis for imposing [*respondeat superior*] liability on the employer"); *Morales v. City of New York*, 59 F. Supp. 3d 573, 583 (S.D.N.Y. 2014) ("[B]ecause Plaintiff has not demonstrated any basis for liability on the part of any of the City's agents or employees, her *respondeat superior* claim also fails."). Those claims against the City are dismissed.

The City can be held liable for Yusuf's surviving unreasonable search claim, however. *E.g.*, *Triolo v. Nassau County.*, — F.4d —, No. 19- 4107-cv, 2022 WL 186567, at *8 (2d Cir. Jan. 21, 2022) (quoting *Jones v. State of New York*, 307 N.E.2d 236, 237 (1973) ("A long line of cases has held the State

31

or municipalities liable for the actions of their police officers in the line of duty.")); *Hawthorne ex rel. Hawthorne v. County of Putnam*, 492 F. Supp. 3d 281, 305 (S.D.N.Y. 2020) (dismissing all but "Plaintiff's *respondeat superior* claim against Putnam County based on [individual defendant officers'] alleged unreasonable . . . search"); *see also Ackerson*, 702 F.3d at 22 (defendant officer's liability for false-arrest claim under New York law created liability for the city defendant "under a theory of *respondeat superior*").  Summary judgment is therefore denied as to Yusuf's state-law unreasonable search claim against the City.

**B.   Event Two: April 17 Execution of Search Warrant**

The Yarbroughs make several claims arising from the April 17 search of their home:  all three allege federal abuse of process and false arrest against Officer DiPresso; Yuliana also asserts a federal excessive-force claim against DiPresso; and Lasandra brings state-law claims for false arrest and abuse of process against DiPresso and the City, plus state-law assault and battery against just the City.

1.   <u>Abuse of Process</u>

The Yarbroughs allege that defendant DiPresso engaged in malicious abuse of process, in violation of Section 1983 and state law, when he searched their home because the "warrant issued for the search . . . was a pretextual search warrant

issued in order to harass, arrest, or otherwise harm Mr. Yusuf." Pl. Opp. 21.

Courts look to state law for the elements of a Section 1983 claim alleging malicious abuse of process. *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). Under New York law, a plaintiff must show that the defendant: "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003). Under the third element, "[a] malicious motive alone does not give rise to a cause of action for abuse of process." *Hernandez v. United States*, 939 F.3d 191, 204 (2d Cir. 2019) (quoting *Savino*, 331 F.3d at 76). Rather, a plaintiff must prove that the defendant acted with "an improper purpose - that is, 'he must claim that the defendant aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.'" *Douglas v. City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009) (quoting *Savino*, 331 F.3d at 76); *see also Hoyos v. City of New York*, 999 F. Supp. 2d 375, 391 (E.D.N.Y. 2013) ("A malicious abuse of process claim thus requires an ulterior purpose such as the infliction of economic harm, extortion, blackmail, or retribution.").

Here, Plaintiffs have produced no evidence that DiPresso sought or executed the search warrant in pursuit of a "collateral purpose."  In fact, it is undisputed DiPresso played no role in seeking the "legal process" about which Plaintiffs complain.  He was instructed to assist with the search, but played no role in the investigation leading to the issuance of the search warrant.  Pl. 56.1 at 21, ¶ 4 (citing DiPresso Dep. 45:7-16); *see, e.g.*, *Bender v. City of New York*, No. 09-CV-3286, 2011 WL 4344203, at *8 (S.D.N.Y. Sept. 14, 2011) (dismissing abuse of process claim against defendant who "only alleged to have participated in the search of Plaintiff's apartment" because there was no allegation that he "played any role in obtaining any 'legal process' to use against her").

The Yarbroughs contend that the officers' interest in Yusuf's whereabouts during the search – asking Lasandra, "where's your son" – demonstrates collateral purpose because the officers were executing a search warrant, not an arrest warrant. Oral Arg. Tr. 51:19-23; Lasandra Dep. 79:1-19.  But the interest in Yusuf's whereabouts is not the kind of "collateral purpose" that an abuse-of-process claim requires — namely, a "collateral advantage or corresponding detriment to the plaintiff which is *outside the legitimate ends* of the process."  *TADCO Const. Corp. v. Dormitory Auth. of New York*, 700 F. Supp. 2d 253, 271 (2010) (emphasis added).  On the contrary, inquiring about the target

34

of an investigation is very much within the legitimate ends of
the investigative process that leads law enforcement to obtain a
search warrant.  And here, DiPresso testified that prior to
executing the warrant, he was informed that Yusuf was the
subject of the investigation.  DiPresso Dep. 44:2-45:16.[21]  This
justified DiPresso's interest in Yusuf's whereabouts; indeed, it
would be surprising, under the circumstances, for the officers
not to have asked if Yusuf was on the premises.

In the end, Plaintiffs cite no case supporting the
contention that officers evidence an improper or "collateral"
objective simply by inquiring into the whereabouts of a suspect
during the execution of a search warrant.  Plaintiffs allege no
more than that the officers "employed legal process . . . for
the purpose," that is, searching the home, "for which the law
created it."  *Hoyos*, 999 F. Supp. 2d at 391.

Decisions identifying improper or "collateral"
objectives are readily distinguishable.  For example, in
*Hernandez v. Wells*, No. 01-CV-4376, 2003 WL 22771982 (S.D.N.Y.
Nov. 24, 2003), the plaintiff alleged that the defendant, a
corrections officer, fabricated assault charges to save his own
job.  *Id.* at *9.  The defendant had been previously disciplined

---

[21] No party produced the supporting affidavit upon which the warrant was
issued.

35

for misconduct and warned that he would be fired if he violated rules or regulations in the future. *Id.* Explaining that this "purpose would be an improper collateral objective because safeguarding one's own employment lies outside the legitimate goal of criminal process," the court allowed the plaintiff's malicious abuse of process claim to proceed. *Id.*; *see also VanZandt v. Fish & Wildlife Serv.*, 524 F. Supp. 2d 239, 246 (W.D.N.Y. 2007) (plaintiffs stated a claim for malicious abuse of process by alleging that defendants' "collateral objective" in obtaining a search warrant was to steal plaintiffs' property); *TADCO Constr.*, 700 F. Supp. 2d at 272 (on a motion to dismiss, plaintiffs adequately alleged that defendants acted for the "improper purpose" of obtaining advantage over plaintiffs in contract disputes).

Because Plaintiffs cannot meet the third element for abuse of process against DiPresso, summary judgment is granted on this claim.

2.  <u>False Arrest</u>

The Yarbroughs' false arrest claims fail because — among other reasons — the officers were justified in briefly detaining Plaintiffs while they searched the home. "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be

imposed by the seizure.'"   *Meuhler v. Mena*, 544 U.S. 93, 98
(2005); *see also Summers*, 452 U.S. at 703 (police have the
authority to detain occupants of a premises while an authorized
search is being conducted).  This defeats the fourth element of
a false-arrest claim under both federal and state law.  *See
Ackerson*, 702 F.3d at 19 (for false arrest claim under Section
1983 and New York law, a plaintiff must prove that "the
confinement was not otherwise privileged").

        In addition, Plaintiffs present no evidence that
DiPresso, the only Defendant present at the scene, personally
confined, or intended to confine, any Plaintiff.  On the
contrary, the record reveals no dispute that DiPresso walked
directly to the back bedroom of the apartment upon entry, where
Brian Thomas was already handcuffed, and then to Aziz
Yarbrough's room.  Pl. 56.1 ¶¶ 48–53.  In the meantime, other
(unidentified) officers handcuffed Lasandra and Yuliana.  Def.
56.1 ¶ 45; Pl. 56.1 at 22, ¶¶ 8–10.  Plaintiffs thus fail to
meet the first requirement for false-arrest – "inten[t] to
confine [the plaintiff]."  *Ackerson*, 702 F.3d at 19.  They also
fail to establish the "personal involvement" of any defendant,
as required for a Section 1983 claim.  *Wright v. Smith*, 21 F.3d
496, 501 (2d Cir. 1994).  Summary judgment is therefore granted
as to Plaintiffs' false arrest claims against DiPresso.

3.  Section 1983 Excessive Force

Plaintiffs likewise fail to show DiPresso's personal involvement in Yuliana's excessive force claim.  "A police officer is personally involved in the use of excessive force if he either (1) directly participates in an assault; or (2) was present during the assault, but did not intervene on behalf of the victim even though he had a reasonable opportunity to do so."  *Corley v. Shahid*, 89 F. Supp. 3d 518, 523 (E.D.N.Y. 2015) (emphasis omitted).  Mere presence at the scene is insufficient; the plaintiff must proffer evidence that the officer "had either awareness of excessive force being used or an opportunity to prevent it."  *Id.*  DiPresso did not place the handcuffs on Yuliana or interact with her at all in the apartment, and there is no evidence that he ever stepped into her bedroom.  An unidentified officer handcuffed Yuliana in her room, and it was to that officer that she "complained immediately" that the handcuffs were too tight.  Pl. 56.1, at 22, ¶ 8-10.  The officer who handcuffed Yuliana told her to "give him a minute," and that he or another officer would loosen them.  Yuliana Dep. 27:7-20.  That officer then loosened Yuliana's handcuffs in the living room.  *Id.*  Because there is no evidence that DiPresso was

present while Yuliana was handcuffed, or heard this exchange, Plaintiffs cannot establish that he failed to intervene.

Moreover, Yuliana fails to show any injury arising from the incident.  As with Yusuf's excessive force claim against Cabrera, she alleges no injury beyond temporary discomfort.  *See Lynch*, 567 F. Supp. 2d at 468.  Thus, even if DiPresso had been involved, Yuliana's momentary wait for an adjustment of her handcuffs would not serve as the basis of liability.  Summary judgment is granted as to Plaintiffs' federal excessive force claim against DiPresso.

    4.  *Respondeat Superior* Claims

Finally, Lasandra brings state-law claims for false arrest, abuse of process, and assault and battery against the City based on *respondeat superior* liability.  Because the Yarbroughs fail to establish liability against any agent or employee of the City, however, the City cannot be held liable.  *See Velez*, 730 F.3d at 137.  As discussed, they have no claim against DiPresso.  And while "there is no requirement that *respondeat superior* liability be predicated on the conduct of an individual who is named as a defendant in the suit," *Tardif v. City of New York*, 344 F. Supp. 3d 579, 592 (S.D.N.Y. 2018), Plaintiffs fail to satisfy the requirements for overcoming summary judgment against any other officer present during the

39

incident.  Lasandra's claims against the City are therefore dismissed.

## C.  Event Three: Yusuf's Arrest on July 19

In relation to his July 19 arrest arising from the robbery of Nieves's dollar van, Yusuf brings Section 1983 claims for malicious prosecution and the denial of a fair trial against Officer Ripa.

### 1.  Malicious Prosecution

To prevail on a claim for malicious prosecution under Section 1983, a plaintiff must show "that (1) the defendant either commenced or continued a criminal proceeding against the plaintiff; (2) the proceeding terminated in plaintiff's favor; (3) that there was no probable cause for the criminal proceeding; and (4) that the criminal proceeding was initiated out of actual malice." *Bonide Prods., Inc. v. Cahill*, 223 F.3d 141, 145 (2d Cir. 2000).  "A successful claim against a police officer also requires some showing that the defendant distorted the process by which [the] plaintiff was brought to trial." *Breeden v. City of New York*, No. 09-CV-4995, 2014 WL 173249, at *10 (E.D.N.Y. Jan. 13, 2014).

Yusuf's claim fails, first and foremost, because he presents no evidence of actual malice.  He relies primarily on (1) Officer Ripa's alleged delay in sending the bus stop video to ADA DiGregorio, and (2) the fact that the case was not

40

dismissed until several days after Nieves's retraction.  Pl.
Opp. 27-28.  The exact length of the alleged delay, though
unknown, was not long.  Ripa testified that he requested the
NYPD bus stop video "a couple of days after the incident."  Ripa
Dep. 142:19-23.  Though he could not recall how many days
exactly, it was "between two and 10 days after the incident."
*Id.* at 143:8-9.  The incident occurred on July 18.  Pl. 56.1
¶ 57.  ADA DiGregorio recalled that she received the bus stop
video from Ripa on July 22 or 23.  DiGregorio Dep. 133:8-11.
Thus, the most the record reveals is that two or three days
elapsed between Ripa's obtaining the video and DiGregorio's
receipt.  And no more than one week elapsed between Ripa's
review of the video and DiGregorio's decision to dismiss the
case on July 28.  *See* Pl. 56.1 ¶ 103.

This short delay, coupled with the lack of any
indication that Ripa intentionally withheld the video from
DiGregorio, cannot serve as the basis of a malice determination.
Nor can the decision to dismiss the case several days after
Nieves's retraction (on July 20), as this decision belonged to
the prosecutor – not Officer Ripa.  *See*, *e.g.*, *Gilman v. Marsh &
McLennan Cos.*, 868 F. Supp. 2d 118, 128 (S.D.N.Y. 2012) ("New
York law imposes a presumption that a prosecutor exercises his
own independent judgment in deciding to prosecute a criminal
defendant.").

Likewise, there is no evidence that Officer Ripa "distorted" the process of Yusuf's criminal proceeding. The evidence shows only that Ripa consistently disclosed to DiGregorio and other prosecutors the information he obtained with regards to the investigation. "[A]n officer who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding." *See Breeden*, 2014 WL 173249, at *10. As discussed, nothing in the record indicates that Ripa intentionally withheld the bus stop video from DiGregorio or interfered in any way with DiGregorio's own decision-making process. *See Alcantara v. City of New York*, 646 F. Supp. 2d 449, 457 (S.D.N.Y. 2009) ("[A] malicious-prosecution claim cannot stand if the decision made by the prosecutor to bring criminal charges was independent of any pressure exerted by the police." (collecting cases)). Summary judgment is therefore granted as to Yusuf's malicious prosecution claim.

### 2.   Denial of the Right to a Fair Trial

Claims for the denial of the right to a fair trial based on fabricated information are restricted to those cases in which "an (1) investigating official (2) fabricate[d] evidence (3) that [was] likely to influence a jury's decision, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of liberty as a result."

*Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016).[22] Unlike a claim for false arrest or malicious prosecution, "probable cause is no defense to a denial of the right to a fair trial claim." *Id.* at 278 (explaining that "probable cause, which is a Fourth Amendment concept, should not be used to immunize a police officer who violates an arrestee's non-Fourth Amendment constitutional rights," such as the right to due process). The requirement that the false information be "likely to influence a jury's decision" means "that the allegedly fabricated evidence [must], at the very least, be material to a viable claim or defense in the criminal case." *Cunningham v. City of New York*, No. 17-CV-5124, 2018 WL 4168964, at *5 (S.D.N.Y. Aug. 30, 2018).

Yusuf contends that he was deprived of his liberty when he was strip-searched and then detained for over twenty-four hours, *see* SAC ¶¶ 54-57, based, at least in part, on the statement in Ripa's arrest report that Yusuf "did while acting in concert with three others punch [Nieves] repeatedly in the

---

[22] "A plaintiff need not have been tried or convicted to assert a fair trial claim, as the constitutional violation occurs when the false information is transmitted to prosecutors." *Nnodimele v. Derienzo*, No. 13-CV-3461, 2016 WL 337751, at *11 (E.D.N.Y. Jan. 27, 2016). Examples of further deprivations include "the number of court appearances a plaintiff made postarraignment, constraints such as bail requirements, a period of incarceration or travel restrictions." *Hanson v. New York City*, No. 15-CV-1447, 2018 WL 1513632, at *17 (E.D.N.Y. Mar. 27, 2018). Here, Yusuf contends that the deprivation of liberty consisted of being taken to Rikers Island, where he was strip-searched and held for over twenty-four hours before he was able to make bail. SAC ¶¶ 54-57.

face and remove jewelry and USC from [Nieves]."  Pl. Opp. 29-30
(citing Omniform Arrest Report, ECF No. 128-15).  In his
deposition, Ripa conceded that this statement was erroneous
because Nieves reported that Yusuf was acting in concert with
others while *somebody* — not necessarily Yusuf — punched him in
the face.  Ripa Dep. 212:16-18.

    Yusuf's claim fails for several reasons.  First, that
this statement in the arrest report lacked evidentiary support
does not, on its own, amount to fabrication.  Yusuf must show
that Ripa *knowingly* fabricated and forwarded false evidence.
*See Ashley v. City of New York*, 992 F.3d 128, 143 (2d Cir. 2021)
(the "fabrication element" requires "that the defendant
knowingly make a false statement or omission"); *Ricciuti v.
N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("Like a
prosecutor's knowing use of false evidence to obtain a tainted
conviction, a police officer's fabrication and forwarding to
prosecutors of known false evidence works an unacceptable
corruption of the truth-seeking function of the trial
process."); *see also Fabrication*, *Black's Law Dictionary* (11th
ed. 2019) ("False information invented to deceive others.").

    Here, the other documents prepared by or with the help
of Ripa – none of which state that Yusuf punched Nieves –
suggest that the erroneous statement was due to negligent
phrasing, at most.  *Cf. Earle v. City of New York*, No. 16-CV-

44

171, 2020 WL 1166706, at *5 (E.D.N.Y. Mar. 10, 2020) (genuine dispute existed as to whether officer "truly 'fabricated' the information in the criminal complaint," or "whether the statement was an unintentional error").  The complaint report, written by Ripa and entered several hours prior to the arrest report, states that an individual named Unique Wooden struck Nieves in the face.  Omniform Complaint Report 2, ECF No. 136-13.  The DA Intake Bureau Crime Report, written by ADA Lasak with the help of Ripa, also states that other individuals, including Wooden, "repeatedly punch[ed]" Nieves, but not that Yusuf punched him.  DA Intake Bureau Crime Report 3, ECF No. 136-15.  Finally, the criminal complaint contains Ripa's sworn testimony that *other* individuals punched Nieves.  Queens County Criminal Complaint 3, ECF No. 136-17.  There is simply no evidence that Ripa fabricated evidence when he wrote the statement at issue.

Second, even if it were fabricated, Yusuf fails to show that the statement would have been reasonably likely to influence a jury's decision.  As discussed, the statement did not appear in the complaint or other documents relating to Yusuf's prosecution.  And there is no evidence that any prosecutor relied on the statement, particularly because the ADAs conducted their own interviews of Nieves and initiated criminal proceedings against Yusuf based on that information.

*See* Pl. 56.1 ¶¶ 76 (ADA Lasak interviewed Nieves before drafting the DA Intake Bureau Crime Report), ¶¶ 92-93 (ADA DiGregorio interviewed Nieves and then reviewed videos with Nieves three days in a row).  Without evidence that the prosecutors relied on the statement or that it otherwise affected the investigation, the Court cannot conclude that the statement was material and likely to influence a jury's decision.

Finally, for similar reasons, Yusuf cannot meet the causation element – that is, that he suffered a deprivation of liberty *as a result* of this statement in the arrest report.  The statement did not appear in the complaint or other documents relating to Yusuf's prosecution, and there is no evidence suggesting that he was charged and detained as the result of the arrest report – as opposed to those other documents.  *See e.g.*, *Walker v. City of New York*, No. 11-CV-0314, 2014 WL 12652345, at *9 (E.D.N.Y. Sept. 3, 2014), *aff'd*, 638 F. App'x 29 (2d Cir. 2016) ("Even if the prosecutor received the false reports and Hennin never corrected the misstatements, there is a complete absence of evidence that the prosecutor relied on the falsities when charging Walker.  Indeed, the evidence is to the contrary.").  Summary judgment is granted as to Yusuf's claim that he was denied the right to a fair trial.

**V.   Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is DENIED as to Yusuf's federal and state-law claims for unreasonable search against Officer Cabrera, as well as his related *respondeat superior* claim against the City for unreasonable search.  Defendants' motion is GRANTED as to Plaintiffs' remaining federal and state-law claims.

SO ORDERED.


_/s/ Eric Komitee_____
ERIC KOMITEE
United States District Judge


Dated:     February 9, 2022
           Brooklyn, New York